UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STACY BLAIN, PH.D. <br><br> Plaintiff, <br><br> v. <br><br> STATE UNIVERSITY OF NEW YORK DOWNSTATE MEDICAL CENTER, VITALY CITOVSKY, RICHARD GRONOSTAJSKI, FRANK MIDDLETON, AND DAVID CHRISTINI <br><br> Defendants. | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> Case No. 22-cv-3022 |

Plaintiff Stacy Blain, Ph.D. ("Dr. Blain"), by her undersigned attorneys, alleges as follows:

**PRELIMINARY STATEMENT**

1.      Institutions of higher learning such as universities should be bastions of integrity, equal opportunity, and advancement -- places where brilliant minds and promising future stars come together to tackle the biggest problems facing our society.  That was the hope of Dr. Blain, a highly accomplished molecular cell biologist who has conducted ground-breaking research to create treatments for drug-resistant forms of breast cancer for the last 20 years, when she joined the faculty of Defendant State University of New York Downstate Medical Center ("SUNY Downstate").  Unfortunately, instead of supporting her and her literal life-saving work, it has discriminated against Dr. Blain because of her sex and retaliated against her when she complained of that discrimination.

2.      As detailed in the pages that follow, Defendant SUNY Downstate's discrimination against Dr. Blain includes chronically underpaying her (as compared to her male colleagues),

refusing to promote her, depriving her of pecuniary and non-pecuniary resources that are available to her male colleagues, and creating a hostile work environment.

3.     After Dr. Blain complained about these problems, the Defendants began a brutal campaign of retaliation against her.  As the main tool in this war, Defendant SUNY Downstate weaponized a three-year-old claim of "research misconduct" -- which had been investigated three times and, in each instance, Defendant SUNY Downstate cleared her of any wrongdoing[1] -- and convened a panel of three men, who proceeded to conduct a biased and predetermined investigation, with no new evidence, to come to the opposite finding of "negligently" failing to supervise a student, which they claim supports their finding of research misconduct.  In their rush to judgment, this "investigation" was so procedurally defective and in violation of Defendant SUNY Downstate's own procedures, it had to be re-started three times, and the manner in which they conducted it led one expert on research-misconduct cases to say, the group "had already become convinced" of her guilt.  This is not a surprise, since, months before Defendant SUNY Downstate decided to wield the old and cleared allegation as a weapon against Dr. Blain, a key SUNY Downstate official told a third party (as detailed below), "people here don't like Stacy."

4.     Even though the unfounded and discriminatory finding of research misconduct -- Defendant SUNY Downstate's fourth bite at the proverbial apple -- is being reviewed by an appropriate federal agency (which has not rendered any findings yet), Defendant SUNY Downstate -- *fearing Dr. Blain will be exonerated* -- has accelerated its scheme to erase her and her work completely, including by (a) removing her from multiple federally funded grant teams (which continues working on the very cancer treatments *she* developed), (b) contacting publications to

---

[1] The basic allegation was that a doctorate student in her lab mislabeled or mispresented a few slides -- out of literally thousands -- of data in published works.  In finding no intentional wrongdoing, the student was cleared to graduate, and did.  But Defendant SUNY Downstate's campaign against Dr. Blain raged on.

withdraw her work, (c) abandoning patents for her therapies (while representing to the federal government that the innovative therapies *she* developed remain valid, which is why they still have the grant), and (d) retaliating against younger, female, diverse members of her lab, who remain loyal to her and her work.  These and many other forms of retaliation are described in painful detail below.

5.      Defendants' conduct violates federal, state, and city law and Defendant SUNY Downstate's own policies.  Accordingly, Dr. Blain brings this action pursuant to the Equal Pay Act, 29 U.S.C. § 206(d)(1), New York Labor Law, N.Y. Lab. L. § 194, the New York State Human Rights Law, N.Y. Exec. L. §§ 290, *et seq.*, and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.*

6.      Collateral to the filing of this complaint, Dr. Blain is filing a charge of discrimination with the Equal Employment Opportunity Commission, alleging violations of Title VII, and will amend this complaint upon her receipt of a Notice of Right to Sue letter.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) over Plaintiff's federal claims.  This Court has supplemental jurisdiction over Plaintiff's claims brought under state and city law pursuant to 28 U.S.C. § 1367.

8.      Venue is properly laid in the Eastern District of New York because a substantial part of the events and omissions giving rise to the claims set forth herein occurred in this District.

## PARTIES

9.      Plaintiff Dr. Blain is a female professor who has had a joint appointment in SUNY Downstate's departments of Pediatrics and Cell Biology since 2002.  She is a distinguished educator and an active researcher.  Prior to the allegations of research misconduct at issue in this matter, she had no record of any professional misconduct.  She has a funded research laboratory

in which she has hired and mentored many Ph.D. and medical students.  In 2016, Dr. Blain co-founded Concarlo Holdings, LLC, which is now Concarlo Therapeutics, Inc. ("Concarlo"), a biotechnology company dedicated to developing treatments to cure breast cancer.[2]

10.     Defendant SUNY Downstate is a public medical school and hospital in Brooklyn, New York.  It is comprised of a College of Medicine, School of Health Professions, College of Nursing, School of Graduate Studies, School of Public Health, and University Hospital of Brooklyn.  SUNY Downstate is an "employer" subject to Title VII, the Equal Pay Act, the New York State Human Rights Law, and the New York City Human Rights Law.

11.     Defendant Dr. Vitaly Citovsky ("Dr. Citovsky") is a professor in the Department of Biochemistry and Cell Biology at the State University of New York at Stony Brook.  He served on the Inquiry Committee and Investigation Committee that Defendant SUNY Downstate convened to investigate the allegations of research misconduct.

12.     Defendant Dr. Richard Gronostajski ("Dr. Gronostajski") is a professor of biochemistry at the State University of New York at Buffalo.  He served on the Inquiry Committee and Investigation Committee that Defendant SUNY Downstate convened to investigate the allegations of research misconduct.

13.     Defendant Dr. Frank Middleton ("Dr. Middleton") is a professor of neuroscience and physiology at the State University of New York Upstate Medical University.  He served on

---

[2] Concarlo was an important part of SUNY Downstate's Biotech Incubator project, through which it sought to commercialize biotech innovations with private investors.  During a tour by then-Lieutenant Governor Kathy Hochul and SUNY Downstate President Wayne Riley, Hochul was highly complimentary of the program, and said as follows: "**By providing biotech businesses with state-of-the-art laboratory space and financial support in the early stages, the SUNY Downstate Biotech Incubator is setting them up with the tools they need to grow into our next entrepreneurial success stories.**"  See https://www.downstate.edu/news-events/news/2018/01-10-2018.html.  Dr. Blain participated in this tour and was photographed with Hochul and Riley.

the Inquiry Committee and Investigation Committee that Defendant SUNY Downstate convened

to investigate the allegations of research misconduct.

14.     Defendant Dr. David Christini ("Dr. Christini") is a Professor of Physiology and

Pharmacology at Defendant SUNY Downstate.   He is also SUNY Downstate's Senior Vice

President for Research.

## FACTUAL ALLEGATIONS

I.     **Defendant SUNY Downstate Treated Dr. Blain Unequally And Paid Her Less Than Her Male Colleagues Because Of Her Sex**

15.     Dr. Blain is a renowned expert in cell cycle and cancer biology with impeccable

credentials.   She received her bachelor's degree in Molecular Biology from Princeton University.

She received her Ph.D. in Molecular and Cellular Biology from Columbia University.   She

completed her postdoctoral fellowship, focusing on molecular biology, at Memorial Sloan-

Kettering Cancer Center.   Dr. Blain has published approximately 28 papers in peer-reviewed

journals.   In addition, she has received funding from, among other sources, the American Cancer

Society, the Susan G. Komen Foundation, and the National Institutes of Health (the "NIH").   She

has devoted most of her career to carry out her mission of finding a cure for breast cancer.

16.     In or about 2002, Dr. Blain joined Defendant SUNY Downstate as a tenure-track

Assistant Professor with a joint appointment in its Cell Biology and Pediatric departments.

17.     Dr. Blain has been active in all areas of life at Defendant SUNY Downstate

throughout her time there.   She conducts research and has a funded research laboratory, where

many Ph.D. students, medical students, and clinical fellows have worked and learned.   She teaches

in the College of Medicine, is the sub-unit Director for the Neoplasia Block (one of the shining

stars of the curriculum), and won the Outstanding Educator award in 2015.   She also serves on

various committees, including the College of Medicine Academic Promotions Committee, the

Search Committee for the Senior Vice President of Research, and the Graduate Student Admissions Committee.

18.     The SUNY Downstate faculty that Dr. Blain joined was, and continues to be, predominantly male.  Of the approximately 33 full-time faculty members in Defendant SUNY Downstate's Department of Cell Biology, only about seven are women.  This disparity has contributed to a workplace environment that is hostile to women and operated by an "old boys' network" that has thwarted opportunities for, and the advancement of, female professors.

19.     Working at SUNY Downstate has been extremely difficult for Dr. Blain in light of its toxic and alpha-male dominated culture.  This became evident from Dr. Blain's earliest years, since 2002, causing her -- like too many women -- to swallow indignities, accept sexist comments and actions from her senior male supervisors, and try to make her family "invisible" to Defendant SUNY Downstate.

20.     In 2003, when a senior male adviser ("Adviser 1") learned that Dr. Blain was pregnant, he started calling her the "soccer mom" in front of other colleagues.  He started sending her unwanted memes depicting "soccer moms."  Eventually, she gingerly approached Adviser 1 and politely asked him to stop.  He became incensed.  Thereafter, for every trivial thing he observed from which he could find fault with Dr. Blain, he did.  One time, after a student left a microscope's light on overnight, resulting in the light bulb burning out, Adviser 1 summoned Dr. Blain to his office and dressed her down.  Another time, Adviser 1 reprimanded Dr. Blain again for hanging her students' presentations on the hallway walls, which is a common practice at SUNY Downstate to celebrate students' work and achievements, calling it "bragging."  Dr. Blain's male colleagues were not reprimanded for participating in this common practice.

21.     Despite Dr. Blain's sterling credentials and many contributions to Defendant SUNY Downstate, it has chronically underpaid her.  Based on information and belief, Dr. Blain is compensated less than her male colleagues.  For example, in 2020, Dr. Blain, who is tenured and was awarded NIH grants, was paid $113,014.  By contrast, a male colleague who was neither a tenured professor nor awarded any NIH grants was paid over $120,000.  Other male colleagues who were either tenured professors or awarded NIH grants (but not both) were paid, on average, over $140,000.  Another male colleague who was tenured and has NIH grants (like Dr. Blain), was paid over $150,000.

22.     In or about September 2021, Dr. Blain's department chair's office recommended that she receive a salary increase, such that she would be paid comparably to her male colleagues.  However, as part of its continuing pattern of discriminating against Dr. Blain by underpaying her relative to her male peers, Defendant SUNY Downstate has refused to accept the recommendation.

23.     During Dr. Blain's entire tenure at SUNY Downstate, she has never received a raise, other than ordinary cost-of-living increases.

24.     An example of the hostility she experienced from the "old boys' network" occurred in or about 2016, when Dr. Blain was supposed to have become eligible for tenure.  Yet, contrary to the terms of Dr. Blain's employment, Dr. Carlos Pato ("Dr. Pato"), the former Dean of Defendant SUNY Downstate's College of Medicine, told Dr. Blain that she was ineligible for tenure because she did not have two Research Project Grants from the NIH.  This purported requirement had never been communicated to Dr. Blain prior to this time.  On information and belief, this requirement has not been imposed on anyone else.

25.     After a year of advocacy by Dr. Blain, her union (the United University Professions), and the Chair of the Faculty of the College of Medicine, Dr. Pato finally relented and

agreed to honor the terms of Dr. Blain's contract and acknowledge her eligibility for tenure.  Dr. Blain applied for tenure in or about January 2017.  She was awarded tenure within four months and was promoted to Associate Professor.

26.     Another example of Defendant SUNY Downstate's workplace "old boys' network" occurred in or about July 2018, when SUNY Downstate renovated its facilities.  In the course of doing so, its workers damaged equipment and samples in several laboratories, including Dr. Blain's.  When Dr. Blain discussed the damage with Dr. Pato, he baselessly blamed her for the damage and refused to pay for any repairs or replacements.  Dr. Blain was forced to prove that she was not at fault for the damage.  In the course of her discussions with Defendant SUNY Downstate's Facilities Management and Development Department to understand what had happened, a worker derogatorily said to Dr. Blain, "Why are you so upset little lady?"  Dr. Blain reported this belittling comment to the worker's supervisors, who dismissed it without any action.

27.     Dr. Blain ultimately proved that she was not at fault for the damage.  Even then, it took nine months for Defendant SUNY Downstate to replace the equipment it damaged. Defendant SUNY Downstate still has not fully reimbursed her for damaged laboratory samples. These delays significantly impeded Dr. Blain's ability to fully conduct her research.   On information and belief, school administrators did not dispute the claims for replacement or reimbursement made by Dr. Blain's male colleagues and in fact provided replacement equipment and financial reimbursements within a matter of weeks after the damage occurred.

28.     In addition, Dr. Blain has received far less non-pecuniary resources than her male colleagues.  She has had little-to-no mentorship.  Between 2005 and 2019, Dr. Blain did not receive a yearly progress review.  She finally received such a review in or about November 2020, after she

notified Defendant SUNY Downstate of the discrimination she experienced, but she did not receive a review in 2021.

29.     This lack of resources has limited Dr. Blain's opportunities for professional growth. On information and belief, Dr. Blain's male colleagues have received mentorship and annual evaluations.

30.     Employees of Defendant SUNY Downstate have continued to perpetuate the "old boys' network," resulting in unequal treatment of Dr. Blain.  Specifically, for example, Dr. Mark Stewart ("Dr. Stewart"), the dean of Defendant SUNY Downstate's School of Graduate Studies, consistently undermined Dr. Blain's authority and position as a mentor and supervisor to the graduate students that work in her laboratory, which he does not do to Dr. Blain's male colleagues. His conduct has harmed Dr. Blain's reputation among her peers and the student body.  This has, in turn, impeded Dr. Blain's ability to attract the best and brightest students to work in her laboratory.

31.     For example, Dr. Stewart has approved students' requests relating to their work in her laboratory and to their graduation trajectories without consulting Dr. Blain.  Dr. Blain would not learn of those decisions, which often contradicted Dr. Blain's decisions, until after they were made.

32.     In the rare instances that Dr. Stewart explained his decisions -- either directly to Dr. Blain or to the students involved -- he frequently stated that Dr. Blain was too tough of a "taskmaster" and had set too high of a standard for the graduate students who worked in her laboratory.

33.     On information and belief, Dr. Stewart does not criticize Dr. Blain's male colleagues as being too "tough" and a "taskmaster," nor does he engage in dismissive and marginalizing conduct towards them.

34.     In one instance, Dr. Stewart independently approved requests for several months' long leaves of absence from Jane Doe 1, a graduate student working in Dr. Blain's laboratory.  Dr. Stewart informed Dr. Blain of this only after he gave his approval to Jane Doe 1's requests. Moreover, he did not provide Dr. Blain clear indication of when Jane Doe 1 would return.  This uncertainty became very disruptive to the work that Dr. Blain was doing in her laboratory and made it difficult for Jane Doe 1 to meet academic deadlines.

35.     Dr. Stewart has also made determinations regarding whether certain students under Dr. Blain's supervision were ready to graduate without consulting Dr. Blain, who had more direct experience with the students and their work.  Often, he would not discuss the bases for his decisions.  These decisions denied Dr. Blain the ability to independently evaluate and work with the students under her supervision.

## II.     Defendant SUNY Downstate Has Used, And Continues to Use, Unsubstantiated Allegations of Research Misconduct in Dr. Blain's Laboratory to Discriminate And Retaliate Against Her, And Destroy Her Reputation

36.     In or about 2016, Jane Doe 1 -- the student whom Dr. Stewart allowed to take long unexplained leaves of absences that caused serious disruptions to the work in Dr. Blain's laboratory -- accused John Doe 1, another graduate student at the time, of committing research misconduct.  Her accusations included mishandling and mislabeling figures in a not-yet-published paper.  The accusations also related to figures in a 2015 paper that Jane Doe 1, John Doe 1, Dr. Blain, and others published in *Molecular and Cellular Biology* (the "2015 MCB Paper").  These accusations created the perfect opportunity for Defendant SUNY Downstate to put its campaign of discrimination into overdrive.

A.     **Initial Investigations In 2016 Into The Accusations Found No Research Misconduct**

37.     Dr. Blain took Jane Doe 1's allegations of research misconduct seriously, and asked a colleague, Dr. Miriam Feuerman ("Dr. Feuerman"), to review John Doe 1's figures in the not-yet-published paper and the 2015 MCB Paper.  Dr. Feuerman is an Associate Professor of Cell Biology at SUNY Downstate.  She is an expert in, and has broad experience with, the type of research John Doe 1 was conducting.

38.     After an extensive investigation (the "Feuerman Investigation"), which included reviewing the primary data supporting John Doe 1's figures, Dr. Feuerman concluded that the allegations were unsubstantiated, and that John Doe 1 had not engaged in research misconduct.

39.     Following the Feuerman Investigation, in or about 2016, Dr. Stewart, as dean of Defendant SUNY Downstate's School of Graduate Studies, initiated another investigation into the allegations.  This second investigation was conducted by Dr. William Chirico ("Dr. Chirico") and Dr. Lorin Weiner ("Dr. Weiner") (the "Chirico and Weiner Investigation," and together with the Feuerman Investigation, the "2016 Investigations").  The Chirico and Weiner Investigation was thorough and lasted several months.  It thoroughly examined John Doe 1's figures.  Dr. Blain cooperated fully with the Chirico and Weiner Investigation.

40.     The Chirico and Weiner Investigation ultimately reached the same result as the Feuerman Investigation:  it did not find any evidence of research misconduct by John Doe 1, Dr. Blain, or anyone else.

41.     On or about December 20, 2016, Dr. Stewart issued a letter summarizing the findings of the 2016 Investigations and providing recommendations to Dr. Blain so as to avoid

such accusations in the future (the "Stewart Letter").[3]   The Stewart Letter did not conclude that John Doe 1 or Dr. Blain committed research misconduct and stated that "there will not be any disciplinary action stemming from this incident."

42.     After the Stewart Letter's issuance, John Doe 1's thesis committee -- another body of independent faculty members -- reviewed John Doe 1's work.  Dr. Christopher Roman ("Dr. Roman") chaired John Doe 1's thesis committee.  Although the purpose of the thesis committee was to determine if John Doe 1 was ready to graduate, it also played a role in identifying potential research misconduct.   The members of the thesis committee were trained, able to identify duplication of figures (the alleged misconduct) in papers, and on heightened alert of the issue (as some members were aware of the 2016 Investigations).  Like Dr. Feuerman, Dr. Chirico, and Dr. Weiner, Dr. Roman and the rest of the thesis committee -- for a third time -- did not find any evidence of research misconduct whatsoever.

43.     Given that there was no finding that John Doe 1 had conducted research misconduct, he was allowed to graduate in 2017.  Shortly after his graduation, he joined Concarlo and worked there until about October 2019.

44.     Moreover, in late 2016, Concarlo was negotiating a license agreement with the Research Foundation for the State University of New York ("SUNY RF"), the research arm of the SUNY system that delivers intellectual property and technology transfer services, to obtain the exclusive rights to patents, technical information, and materials derived from Dr. Blain's research. Dr. Stewart represented SUNY RF in the negotiations in his dual role as institutional signing officer.  During the pendency of the 2016 Investigations, although Dr. Blain had no reason to

---

[3] The Stewart Letter listed "several features of concern" identified by an "original set of PowerPoint figures presented for review" and "examples of concern" that Dr. Chirico and Dr. Weiner identified in the 2015 MCB Paper.

question the propriety of John Doe 1's research, Concarlo, in an abundance of caution, was concerned about executing a license for technology based on potentially suspect research. Dr. Stewart was aware of this concern. The day after Dr. Stewart issued the Stewart Letter clearing John Doe 1 of any wrongdoing, he signed the license agreement with Concarlo.

**B.     In 2019, Defendant SUNY Downstate Baselessly Reopened The Investigation Despite Prior Findings of No Misconduct**

45.     Despite the various investigations of John Doe 1's work and the issuance of the Stewart Letter concluding the matter without any findings of research misconduct, in 2019, Defendant SUNY Downstate re-opened the investigation as part of its campaign of discrimination against Dr. Blain.

46.     In about July 2019, Lisa Marie Casey, Concarlo's then-Chief Operating Officer, submitted to Defendant SUNY Downstate a twice-annual progress report regarding Concarlo, asking, *inter alia*, to extend the 3-year timeframe of the "Licensed Materials" of the licensing agreement between Concarlo and SUNY RF.

47.     On or about July 19, 2019, Ms. Casey met with David Schoenhaut, the Director of the Office of Technology Commercialization at SUNY Downstate. During that meeting, Mr. Schoenhaut stated words to the effect of:  "**people here don't like Stacy; we are never going to agree to extend the 3-year timeframe of the 'Licensed Materials' definition** and I need you to change the wording around 'collaboration' between Concarlo and SUNY RF." Ms. Casey asked for more information about people's dislike of Dr. Blain, but Mr. Schoenhaut declined to provide more information. Mr. Schoenhaut requested that Ms. Casey re-write the cover letter of the report so that it did not discuss the "collaboration" between Concarlo and SUNY RF, which she did.

48.     Defendant SUNY Downstate's opportunity to tighten the screws on Dr. Blain came the following day, July 17, 2019, when the Office of Research Integrity ("ORI"), an office within

the U.S. Department of Health & Human Services, sent a letter to Defendant SUNY Downstate stating that it "received allegations of possible research misconduct against Stacy Blain" (the "2019 ORI Letter").  ORI explained that it had "examined this matter and determined that the allegations represent possible falsification and/or fabrication of data and that a formal inquiry is required."

49.     The allegations in the 2019 ORI Letter related to six figures in the 2015 MCB Paper and one figure in a 2010 paper published in the *Journal of Pediatric Gastroenterology and Nutrition* (the "2010 JPGN Paper").  The 2015 MCB Paper had been examined during the 2016 Investigations and both papers were peer-reviewed before publication.  In fact, the 2015 MCB Paper was reviewed by several SUNY Downstate faculty members -- Dr. Susan Gottesman, Dr. Sabrina Hrabetova, and Dr. Roman -- and nine outside peer reviewers.  The 2010 JPGN Paper, of which Dr. Blain was not the corresponding author (*i.e.*, the author with primary responsibility for communicating with the journal), was also reviewed by multiple peer experts.

50.     For both papers, the first authors (*i.e.,* the authors who made the most significant intellectual contribution to the papers) worked in Dr. Blain's laboratory and Dr. Blain was listed as a co-author.  Dr. Blain was the principal investigator, who designed the experiments, handed them off to technicians, and oversaw her team's work, including reviewing the results of their experiments.

51.     The 2019 ORI Letter provided instruction on how Defendant SUNY Downstate was to proceed.  It stated that "[t]here is no presumption of wrongdoing in this matter."  It also instructed SUNY Downstate that, "[i]f your institution has already conducted an inquiry or review of this matter," to "please send us a copy of the report of the findings."

52.     In contravention of ORI's instructions, and as part of its discriminatory agenda against Dr. Blain, Defendant SUNY Downstate did not send ORI a copy of the Stewart Letter or otherwise notify ORI that it had conducted multiple investigations of the allegations in or about 2016.  It failed to do so even though Defendant SUNY Downstate understood that the allegations were the same as those lodged against John Doe 1 in 2016.  Shoshana Milstein, who was tasked with administratively leading an inquiry, later explained during a transcribed meeting with Dr. Stewart that Defendant SUNY Downstate "received this communication from the ORI with these **allegations that had already been reviewed back in 2016**."  She confirmed that the allegation in the 2019 ORI Letter was the same as the one that had been resolved in the Stewart Letter.

53.     On or about August 6, 2019, Dr. Blain received a letter from Heidi Aronin, Chief Administrative Officer and Institutional Official for Research for Defendant SUNY Downstate, notifying her of the renewed allegations and informing her that Defendant SUNY Downstate would conduct an inquiry.  Ms. Aronin wrote, among other things, "[t]he purpose of this Inquiry is to evaluate the available evidence and to determine whether there is sufficient evidence of possible scientific misconduct to warrant an Investigation."

54.     Later, on or about August 6, 2019, Dr. Blain returned from her vacation early to meet with Ms. Milstein and provide the evidence relevant to the inquiry.  Three days later, Dr. Blain notified William Versfelt, the Assistant Chief Campus Counsel of Defendant SUNY Downstate, that she found additional documents relevant to the inquiry and made them available.  Defendant SUNY Downstate did not collect the documents for months.  Later on, the Investigation Committee, ignoring Defendant SUNY Downstate's prior lackadaisical effort in collecting evidence that Dr. Blain diligently identified, baselessly accused Dr. Blain of hiding relevant

evidence on cloud-based accounts, but did not specify what evidence it believed was on cloud-based accounts.

55.     On or about September 3, 2019, Ms. Aronin notified Dr. Blain by letter that she had finished appointing an inquiry committee, consisting of Defendants Dr. Citovsky, Dr. Gronostajski, and Dr. Middleton, that would begin its work on or about September 11, 2019 (the "Inquiry Committee").

56.     On or about October 15, 2019, the Inquiry Committee began interviewing witnesses.  It first met with Dr. Weiner on or about October 15, 2019 and Dr. Chirico on or about October 17, 2019.  Although the Inquiry Committee was unprepared for these interviews, it did not engage in the type of retaliatory and defamatory conduct that it would engage in two weeks later, *after* Dr. Blain filed a discrimination complaint with Defendant SUNY Downstate.

57.     On or about October 22, 2019, in the middle of the Inquiry Committee's interview schedule, and less than a week before Dr. Blain's interview, Mr. Versfelt finally met with Dr. Blain to gather the documents that she had identified over two months earlier.  At this meeting, Mr. Versfelt indicated that Defendant SUNY Downstate had not reviewed any of the materials that it had previously collected, and asked Dr. Blain to repeat the exercise of explaining how documents were kept and labelled, which she had previously done.

**C.     After Dr. Blain Complained Of Defendant SUNY Downstate's Discriminatory Treatment, Defendants Retaliated Against Dr. Blain By Escalating Its Unfair Witch Hunt**

58.     On or about October 23, 2019, Dr. Blain's counsel sent a letter to Mr. Versfelt, discussing, among other things, the history of sex-based discriminatory actions against her by the SUNY Downstate administration.

59.    Enraged that Dr. Blain had the audacity to complain about her unfair treatment, Defendant SUNY Downstate quickly began using the inquiry as a tool for retaliating against Dr. Blain.

60.    On or about October 28, 2019, the Inquiry Committee interviewed Dr. Blain and three other witnesses, Dr. Madiha Akhtar, Dr. Roman, and Dr. Stewart.  During the interviews of Dr. Roman and Dr. Stewart, the Inquiry Committee not only presumed that Dr. Blain was guilty of research misconduct, but it also falsely told the witnesses of her supposed guilt.

61.    The Inquiry Committee told Dr. Roman, in his transcribed interview, that the Stewart Letter, of which Dr. Roman did not have personal knowledge, had concluded that the 2015 MCB Paper relied on "falsified data" and implied that there was "clearly falsification of data." That was a lie.  The Stewart Letter made no such conclusions.

62.    The Inquiry Committee also falsely told Dr. Roman during his transcribed interview that "the Research Integrity Office showed that . . . bands . . . were manipulated to look differently" and that the manipulation was "done with premedation."  This was also a lie.  The 2019 ORI Letter made no statements regarding "premeditation," let alone a determination about data manipulation; instead, it had asked SUNY Downstate to conduct an inquiry.

63.    Similarly, the Inquiry Committee told Dr. Stewart, who had authored the Stewart Letter absolving Dr Blain of the very conduct at issue, during his transcribed interview that "the Office of Research Integrity analyzed [the 2015 MCB] paper and did find that exactly the same bands, not bands that looked similar, but exactly the same bands were cut and pasted to mean two different things.  And that is almost by definition research misconduct."  Again, ORI had made no such analysis or any factual findings.

64.     These defamatory statements, made in retaliation for Dr. Blain's complaining of the discrimination she long experienced, contravened the 2019 ORI Letter, which clearly stated that the allegations did not constitute a determination of research misconduct and, among other things, that ORI had "received allegations of **possible** research misconduct," requested that Defendant SUNY Downstate "initiate a formal inquiry into the matter **to determine whether an investigation of possible research misconduct is warranted**," and "[t]here is **no presumption of wrongdoing** in this matter."

65.     The Inquiry Committee's false statements not only damaged Dr. Blain's reputation (her colleagues started avoiding her), but also undoubtedly biased the witnesses, ensuring that any further investigation of Dr. Blain into this matter could not possibly be conducted fairly and objectively.

66.     On October 28, 2019, the Inquiry Committee interviewed Dr. Blain.  During this meeting, the Inquiry Committee reviewed each of the figures alleged to have constituted research misconduct.  Dr. Blain provided clear and thorough explanations for why the figures in question were appropriate.  For the figures in the 2015 MCB Paper, Dr. Blain used notebooks with the primary data underlying the figures to explain the science, which the Inquiry Committee had apparently not reviewed prior to the interview.

67.     During the interview, the Inquiry Committee disregarded Dr. Blain's explanations of the figures and underlying data without engaging in substantive scientific discourse.  Instead, it recited preordained conclusions of Dr. Blain's alleged guilt.  For example, during the transcribed interview, Defendant Dr. Gronostajski pointed to similar-looking figures and asserted:  "Pixel by pixel, this is identical to that.  So they could not be from one sample being incubated with manganese and the other with magnesium and run on the gel because these are exactly the same

panels, that's what they're saying."  Moreover, without any evidence, he concluded during the interview that Dr. Blain's purported research misconduct was done by cutting and pasting images.

68.     In response, Dr. Blain explained how she oversaw the work of the technicians and students in her laboratory.  She did not generate the data or create the figures at issue and instead, reviewed her technicians' and students' figures to ensure that they accurately reflected the raw data.  She presented the Inquiry Committee the raw data and explained, in sum, that the figures looked similar because the underlying data that the technician generated was similar.

69.     The Inquiry Committee could not rebut Dr. Blain's explanations and it admitted to lacking the experience and preparation necessary to review the figures and underlying data. Defendant Dr. Middleton stated during Dr. Blain's transcribed interview that he "didn't read the 2015 paper" in which most of the figures are found.  Defendant Dr. Citovsky also said during the interview that he was not given the notebooks with primary data -- and thus, did not review them -- prior to Dr. Blain's interview.

70.     The Inquiry Committee made similar confessions during its interview of John Doe 1.  For example, after John Doe 1 provided his explanation for a figure, Defendant Dr. Citovsky replied:  "I made no sense of what you just said, but I don't have any more questions about it."  He made no attempt to understand the scientific explanation and admitted to not having experience with the machines used to generate the scientific data at issue.

71.     Notwithstanding the Inquiry Committee's lack of knowledge or experience, it adopted a belittling posture towards Dr. Blain.  At one point during Dr. Blain's interview, Defendant Dr. Citovsky told her that he had "been longer in this field and [was] more advanced" than she was, and his "other results were not so bad," implying that he could do a better job than Dr. Blain, despite his lack of understanding of the science at issue.  These condescending

comments, reflecting the "old boys' network" at Defendant SUNY Downstate, were not made to any of the male witnesses, including John Doe 1, whose work was the subject of the research misconduct allegations.

72.     On or about November 26, 2019, the Inquiry Committee issued its draft inquiry report.  The Inquiry Committee's principal determination was "that the allegation of research misconduct on the part of Dr. Stacy Blain warrants an investigation based upon the initial review of the available evidence."  This determination was not supported by evidence and contradicted the testimony of those who the Inquiry Committee interviewed.  For example, the draft inquiry report claimed that "Dr. Blain could not explain, and did not acknowledge, that several other bands and background areas contained in the gel images in publications from her lab appear to be duplicates as well" and that "[w]hen presented with apparently identical images appearing in lanes from different conditions . . . Dr. Blain refused to agree that they were in fact identical in appearance . . . ."  These statements are demonstrably false.  During Dr. Blain's transcribed interview, she acknowledged that certain images were identical and explained why that result was supported by the data that her team generated, which she reviewed.

73.     On or about December 11, 2019, Dr. Blain issued her objections to the draft inquiry report in a letter addressed to Heidi Aronin.

74.     On or about December 16, 2019, Ms. Aronin issued a letter notifying Dr. Blain that the Inquiry Committee reviewed her objections and finalized the inquiry report with no further changes.  It recommended an investigation of the allegations of research misconduct.

75.     In the letter, Ms. Aronin proposed that the "[t]he Investigation Committee will consist of the same external SUNY faculty experts that comprised the Inquiry Committee."  After Dr. Blain challenged this due to the Inquiry Committee's prior misconduct and demonstrated

personal bias, Defendant SUNY Downstate agreed to convene an investigation committee consisting of the Inquiry Committee -- Defendants Dr. Citovsky, Dr. Gronostajski, and Dr. Middleton -- and add two additional members, Dr. Patricia Kane and Dr. Laurie Read (the "Investigation Committee").

76.     Defendant SUNY Downstate used the investigation to perpetuate its pattern and practice of discriminating and retaliating against Dr. Blain.  It conducted the investigation in an unusually haphazard manner that, upon information and belief, has never been the case for Dr. Blain's male colleagues.

77.     Despite adding Dr. Kane and Dr. Read to the Investigation Committee, the course of the investigation and the Investigation Committee's unsupported conclusions make it clear that Defendants Dr. Citovsky, Dr. Gronostajski, and Dr. Middleton had prejudged the outcome during the inquiry, prejudiced the two additional members, and remained determined to ensure that their conclusions were reached at the end of the investigation.  Although it was charged with interviewing the co-authors of the publications in question (there were about 11 authors to the 2010 JPGN Paper and the 2015 MCB Paper), the Investigation Committee only conducted two interviews before it tendered its initial draft of its investigation report to Dr. Blain.  Moreover, one of the new Investigation Committee members did not even attend one of those two interviews. Most of the questioning during those interviews was done by the Inquiry Committee members.  As the majority of the Investigation Committee, Defendants Dr. Citovsky, Dr. Gronostajski, and Dr. Middleton drove the Investigation Committee's unsupported and preordained conclusions.

78.     On or about July 22, 2020, the Investigation Committee produced an initial draft of its investigation report that was so severely inadequate, as described in Dr. Blain's first round of extensive rebuttal comments that she submitted to Mr. Versfelt by letter on or about September 4,

2020, that Defendant SUNY Downstate needed more than another year to conduct additional investigation and, essentially, redo its work.

79.     On or about October 29, 2021, Dr. Blain provided comments to a second, revised, draft of the Investigation Committee's report.  Despite having substantial time to conduct the investigation, the Investigation Committee continued to misinterpret Dr. Blain's explanations of the data without bothering to ask Dr. Blain for clarification when necessary, and even failed to interview key witnesses, including the two researchers who were primarily responsible for generating and/or reviewing some of the data at issue.  Another key witness that was not interviewed has worked in Dr. Blain's laboratory since 2003 and was identified repeatedly by Dr. Blain as a witness with relevant information regarding the allegations.

80.     Remarkably, in interviewing the former lab member who served as the first author of the 2010 JPGN Paper, the Investigation Committee found that individual's interview responses "honest, without obfuscation" despite her inability "to supply original data that matches exactly" the figure at issue or to otherwise explain the apparent identity of several bands.  The disparity with which the Investigation Committee treated this witness, as opposed to Dr. Blain, underscores Defendant SUNY Downstate's retaliatory bias and animus towards Dr. Blain personally (which became manifest *after* she filed a complaint of discrimination) and the foregone conclusion of the investigation, despite a preponderance of the evidence weighing against any research misconduct findings.

81.     On or about December 2, 2021, the Investigation Committee released a final report (the "Investigation Report").  In it, and in the prior drafts, the Investigation Committee relied on its "opinion that any reasonably trained modern cell biologist or biochemist" would have recognized errors in the figures in Dr. Blain's papers, baselessly implying that Dr. Blain was not a

reasonably trained scientist and ignoring the fact that multiple such scientists reviewed the figures without recognizing any errors.

82.     Many of the Investigation Committee's conclusions are based on its improper shifting of its burden of proof onto Dr. Blain.   Instead of making findings supported by a preponderance of the evidence, the Investigation Committee took its own opinion that Dr. Blain failed to exonerate herself as affirmative evidence of her wrongdoing.   Even though Dr. Blain fully cooperated and complied with her obligations by providing the Investigation Committee with all the relevant lab notebooks and other sources of raw data in her and her lab's possession, the Investigation Committee nevertheless claimed that Dr. Blain was "uncooperative" because she did not herself undertake hundreds or thousands of hours to review former lab members' notebooks to identify raw data.   That, quite simply, was the Investigation Committee's responsibility.

83.     The Investigation Report concluded that Dr. Blain had committed research misconduct because three of her papers -- of which she was a co-author, sometimes with several other cancer researchers from SUNY Downstate and elsewhere -- have instances of either mislabeled data, manipulated images, or "beautified" data presentations, of which she was unaware.   Repeatedly, the Investigation Report claimed she "should have" been aware, so the report is essentially a finding of negligence.

84.     The Investigation Report declared "many of these image manipulations would be **readily apparent** to any cell biologist."   The Investigation Committee nowhere explained why or how such "readily apparent" manipulations made it through the exhaustive and exacting peer-review process with no one noticing the few examples at issue.   Nor did they explain how the 2016 Investigations missed the allegedly "readily apparent" manipulations.

85.     Nowhere did the Investigation Report explain why, if there were problems with the data, Defendant SUNY Downstate -- whose faculty members helped peer-review the 2015 MCB Paper, investigated the allegations of research misconduct against John Doe 1 in 2016, and approved the research at issue -- was not itself negligent.  It simply placed blame on Dr. Blain.

86.     On or about December 14, 2021, the SUNY Downstate official with final authority over the investigation accepted the Investigation Committee's determination.

87.     Appended to the Investigation Report was a list of "Pending Institutional Administrative Actions," which indicated that, among other actions, Defendant SUNY Downstate would contact journals to publish corrections, notify the NIH of the Investigation Committee's findings, and assess Dr. Blain's ability to serve as principal investigator on a going-forward basis.

88.     On or about February 4, 2022, Dr. Blain objected to the Investigation Report and notified ORI of her objections in a letter.  In that letter, Dr. Blain's counsel explained that the preponderance of evidence did not support a finding that Dr. Blain acted with intent or recklessness during her review of the allegedly erroneous figures.  Specifically, as a principal investigator, Dr. Blain did not generate the data or create the figures at issue.  Instead, her role was to design the experiment, hand it off to a technician, and rely on her employees to accurately reflect the results of the experiment for her subsequent review.  Dr. Blain did so, fulfilling her responsibilities as the principal investigator.  She exercised a level of oversight that is consistent with the accepted practices of other principal investigators.  Dr. Blain demonstrated during the investigation that the figures she reviewed appeared to accurately reflect the original data and therefore were likely not erroneous or the result of research misconduct.

89.     Even though ORI has yet to finish its review of the matter, Defendant SUNY Downstate has used the baseless and predetermined conclusions of the biased Investigation

Committee that it empaneled to further discriminate against Dr. Blain. Beginning in or about December 2021 and continuing through in or about late February 2022, Defendant SUNY Downstate indicated that it intended to take disciplinary action against Dr. Blain by revoking her tenure and removing her from employment the week of March 1, 2022.

90.     On or about May 12, 2022, Defendant SUNY Downstate notified Dr. Blain of its intent to initiate formal disciplinary proceedings.

91.     These sorts of threats are, unfortunately, consistent with Defendant SUNY Downstate's history of fostering a discriminatory workplace and retaliating against Dr. Blain for raising her discrimination claims against the institution in October 2019.

**III.    Defendant SUNY Downstate Has Retaliated Against Dr. Blain For Issuing a Complaint of Discrimination By Seeking to Erase Her Publications, Removing Her From Her Grants, And Causing SUNY RF to Abandon Her Patent**

92.     Defendant SUNY Downstate never had an interest in rectifying the pattern of discrimination it aimed toward Dr. Blain. Upon receiving the October 23, 2019 letter from Dr. Blain's counsel to Mr. Versfelt, discussing, among other things, the history of sex-based discriminatory actions against her by the SUNY Downstate administration, Defendant SUNY Downstate tried to brush away the allegations so that it could continue its campaign of unfair treatment of Dr. Blain.

93.     In a letter dated November 1, 2019, Mr. Versfelt stated that he "encourage[d] Dr. Blain to discuss her concerns with her Chair and/or Dean" and that "[s]he may also report any concerns about possible discrimination to SUNY Downstate's Office of Diversity & Inclusion (ODI)." In essence, he put the burden back on Dr. Blain, the victim of discrimination, to find someone who would take her claims seriously.

94.     On or about November 5, 2019, Dr. Blain's counsel responded to Mr. Versfelt's November 1, 2019 letter, stating that, because Mr. Versfelt and his office were on notice of the

discrimination, it was incumbent on Defendant SUNY Downstate to investigate the allegations and that the burden should not be on Dr. Blain to find a willing listener.

95.     On or about November 8, 2019, Mr. Versfelt stated that he forwarded Dr. Blain's claims of sex-based discrimination to Defendant SUNY Downstate's Office of Diversity & Inclusion, which is responsible for investigating such claims.  He stated that "Dr. Blain can expect to be contacted by [the Office of Diversity & Inclusion] in the course of its own thorough investigation."

96.     On or about December 4, 2019, Dr. Blain met with Defendant SUNY Downstate's Office of Diversity & Inclusion to discuss the history of sex-based discrimination she long suffered.

97.     Since that meeting, Defendant SUNY Downstate has taken no further action to investigate Dr. Blain's claims, nor has Dr. Blain received any notification from the institution that her claims are unfounded.

98.     Defendant SUNY Downstate has yet to take any remedial steps on Dr. Blain's allegations of discrimination, such as paying her equally relative to her male colleagues.

99.     Instead, Defendant SUNY Downstate has retaliated against Dr. Blain by taking increasingly hostile and harmful actions against her.

100.     Specifically, on or about February and March 2020, Dr. Blain applied, and received committee approval, for bridge funding to pay her employees for the period between federal Research Project grants.  Despite the approval, Defendant SUNY Downstate denied Dr. Blain's application and ignored her follow-up communications regarding the application.

101.     In or about July 2020, Concarlo received a Small Business Innovation Research grant from the NIH, with Defendant SUNY Downstate as a sub-awardee.  Defendant SUNY

Downstate refused to approve its portion of the grant, even though it had previously approved it in April 2020. This unreasonable decision effectively prohibited Concarlo from accepting the award to which it was entitled. In doing so, Defendant SUNY Downstate told a Concarlo employee that it would not approve the award because of allegations of research misconduct pending against Dr. Blain, breaching Dr. Blain's right to a confidential investigation guaranteed by, among other things, Rules 4.1 and 6.10 of SUNY Downstate's Research Misconduct Policy and Procedure. After a long period of direct advocacy by Dr. Blain, Defendant SUNY Downstate eventually approved the award.

102.    In or about July 2020, Dr. Blain received a grant from the NIH with an investigator from the Roswell Park Cancer Center (Grant 1R21CA252585-01). Defendant SUNY Downstate again tried to withhold its approval of the grant. Defendant Dr. Christini ignored Dr. Blain's emails about the award and also ignored correspondence from Roswell Park about the award. After weeks of Dr. Blain's tireless effort to resolve the situation, Defendant SUNY Downstate finally approved the grant. However, it decided to release the funds in installments on a monthly basis, even though Dr. Blain was entitled to the full grant, thereby limiting Dr. Blain's use of the funds she earned.

103.    Separately, in or about April 2021, when Dr. Blain received a significant $4.5 million grant from the NIH, Defendant Dr. Christini sent a congratulatory email to a male colleague who received a sub-award on the grant. Despite her being copied on the email, Dr. Blain was not acknowledged. This was a significant award for Defendant SUNY Downstate, but contrary to its usual practice when male faculty members receive such awards, Defendant Dr. Christini and his office did not acknowledge Dr. Blain or this award in its newsletters or reports.

104.    On or about February 28, 2022, SUNY RF notified Concarlo that it had moved to withdraw the application for, and expressly abandon, a patent for which Dr. Blain was the inventor

and SUNY RF was the assignee. It did this on the Friday before the Tuesday when the patent was to be issued, thereby ensuring that Dr. Blain had no ability to defend the patent, which was the product of years of Dr. Blain's and Concarlo's work. This action was in violation of SUNY RF's obligations to Dr. Blain because, among other things, SUNY's Patents, Inventions and Copyright Policy requires that decisions regarding the protection and maintenance of intellectual property be made in consultation with the creator of said property, which in this case was Dr. Blain. *See* 8 NYCRR 335.28(f). In violation of this policy, SUNY RF only notified Concarlo of its abandonment of the patent *after* it had taken the drastic action, and it never notified Dr. Blain.

105. Upon information and belief, SUNY RF knows that the technology underlying the abandoned patent is viable and potentially lucrative and it has since reapplied for the same patent.

106. Upon information and belief, Defendant SUNY Downstate provided to SUNY RF false information related to its retaliatory and discriminatory investigation against Dr. Blain to support the abandonment of the patent application. Indeed, in an email to Concarlo, SUNY RF stated that its actions were due "to issues related to publications referenced in, and in figures of, the patent application." The publications and figures it referenced are those at issue in the research misconduct allegations.

107. There was no reason for Defendant SUNY Downstate to cause SUNY RF to abandon the patent other than to retaliate against Dr. Blain for filing a complaint of discrimination. Prior to Dr. Blain filing her discrimination complaint in October 2019, Defendant SUNY Downstate had no issues with the patent, despite knowing about the allegations of research misconduct. Defendant SUNY Downstate had been aware of the unsubstantiated allegations since 2016, when they were first raised against John Doe 1. In addition, in 2019, around when Defendant SUNY Downstate reopened the investigation, but before Dr. Blain made her complaint of

discrimination, Concarlo asked David Schoenhaut whether Defendant SUNY Downstate and SUNY RF needed to take any action because the patent application included one of the figures at issue and he replied in the negative.  However, after Dr. Blain filed her discrimination complaint, Defendant SUNY Downstate caused SUNY RF to abandon the patent application.

108.     In or about late February 2022, Defendant SUNY Downstate notified Dr. Blain's counsel that it intended to remove Dr. Blain as the principal investigator on her grants.  Defendant SUNY Downstate initially expressed a willingness to work with Dr. Blain on finding a replacement principal investigator.  However, in or about March 2022, Defendant SUNY Downstate removed Dr. Blain from one of her grants -- Grant 1R01CA249667, awarded by the National Cancer Institute -- without first discussing it with her.  Dr. Blain had recommended, as a replacement principal investigator, a SUNY Downstate colleague who was working on the grant, had developed the technology described in the grant, and was the first author of the published manuscript that enabled the grant.  The recommended principal investigator's department chairman agreed that she would be a good replacement and sought approval from the Dean of SUNY Downstate's College of Medicine.    Nonetheless, Defendant SUNY Downstate ignored Dr. Blain's recommendation of the most suitable replacement and Defendant Dr. Christini reassigned the grant to someone who does not have experience with the subject matter of the grant and is not qualified to work on it.  Defendant SUNY Downstate claimed that the NIH instructed it to replace Dr. Blain as the principal investigator but refused to provide any evidence of such instruction.

109.     On or about May 12, 2022, Dr. Blain learned that Defendant SUNY Downstate removed her from another NIH grant, which she obtained with an investigator from the Roswell Park Cancer Center.   Defendant SUNY Downstate reassigned it to a researcher at SUNY

Downstate that has not done any work on the project in two years.  The more suitable replacement would have been the investigator from Roswell Park.

110.    Having been removed from the grants that she earned, Dr. Blain is unable to conduct her important research.  Defendant SUNY Downstate has further caused the NIH to remove from public records the fact that Dr. Blain had applied for, and was awarded, two NIH grants, thereby injuring her reputation by depriving her of a prestigious accomplishment.

111.    Moreover, although Defendant SUNY Downstate removed Dr. Blain from the grants purportedly due to her research misconduct, it clearly believes in the integrity of her research.  By replacing her with other SUNY Downstate researchers who will attempt to continue Dr. Blain's work on the grants, Defendant SUNY Downstate essentially stands by Dr. Blain's work and research while it is simultaneously trying to discredit her.

112.    Upon information and belief, between January 2022 and April 2022, in the course of replacing Dr. Blain as the principal investigator of an NIH grant, Defendant Dr. Christini defamed Dr. Blain by telling Dr. Jenny Libien that the NIH had determined that Dr. Blain committed research misconduct and had instructed Defendant SUNY Downstate to remove Dr. Blain from the grant.  This was false.  As an initial matter, ORI, and not NIH, has oversight of research misconduct matters and makes determinations as to whether there should be any federal findings of research misconduct.  Furthermore, the ORI matter is still pending, and it has not reached any decision on the merits of the allegations.

113.    Around this time, others within the SUNY Downstate administration stated to Dr. Blain's colleagues that the NIH had determined that Dr. Blain committed research misconduct. On or about April 15, 2022, Dr. Stephen Wadowski, the chairman of Dr. Blain's department, told her that he learned from Defendant Dr. Christini that the NIH had determined that she committed

research misconduct.  After Dr. Blain denied this allegation, Dr. Wadowski agreed to speak to Defendant Dr. Christini about it.

114.   Upon information and belief, Defendant Dr. Christini also defamed Dr. Blain by telling Dr. James Knowles, the retiring Chair of Cell Biology, and Dr. Roman, the interim Chair of Cell Biology, that Dr. Blain committed research misconduct.

115.   Defendant SUNY Downstate and its employees knowingly made the false statements about the NIH's purported findings of research misconduct as part of its pattern of retaliating against Dr. Blain for complaining about its discriminatory conduct.  It has harmed Dr. Blain's reputation and business interests.  By removing Dr. Blain from her grants, she is unable to conduct her important research or complete projects that have been in the works for years.

116.   On information and belief, in or about April 2022, Defendant SUNY Downstate contacted *Molecular and Cellular Biology* and *Journal of Pediatric Gastroenterology and Nutrition* and stated that Dr. Blain committed research misconduct and recommended that certain papers be retracted.

117.   Contrary to Defendant SUNY Downstate's list of "Pending Institutional Administrative Actions," which indicated that it would contact journals to make *corrections*, Defendant SUNY Downstate asked the journal to make full *retractions*.  There was no basis for this request, as ORI had not completed its investigation.  These communications -- predicated on the false premise that independent investigators had found evidence of research misconduct so severe that the papers' findings are unreliable -- served no purpose but to harm Dr. Blain's reputation, business, and research opportunities.  More importantly, if the journals retract Dr. Blain's papers, as Defendant SUNY Downstate requested, her reputation will be damaged beyond

repair because, even if ORI ultimately exonerates her, the retractions will remain in the public domain.

118.    Dr. Blain is not the only victim of Defendant SUNY Downstate's discrimination and retaliation.  It has also taken, and is still taking, steps of retaliation against Dr. Blain's younger technicians, who remain fiercely loyal to her.

119.    These retaliatory steps that Defendant SUNY Downstate has taken against Dr. Blain are much more severe than the sanction that ORI might impose if it were to find that Dr. Blain committed research misconduct (which it is unlikely to find).  Based on publicly available records of ORI disciplinary actions, it is clear that researchers who have engaged in more serious research misconduct than that of which Dr. Blain has been accused have received less severe sanctions than what Defendant SUNY Downstate has done.[4]

**FIRST CAUSE OF ACTION**
**(Violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1))**
**(Against Defendant SUNY Downstate)**

120.    Plaintiff repeats and realleges the allegations in paragraph 1 - 119 as if fully set forth herein.

---

[4] Just this year, for example, ORI found that a former Professor of Orthopedic Surgery at the Albert Einstein College of Medicine engaged in research misconduct by falsifying or fabricating data in sixteen grant applications submitted for U.S. Public Health Service (PHS) Funding, and, as a result, required that the respondent have his research supervised by a committee of senior faculty for twelve years, that his employer submit certification that his research is legitimate with all applications for funding, and that he exclude himself from serving in an advisory or consultant capacity to PHS.    *See Case Summary: Sun, Hui Bin*, Office of Research Integrity (available at https://ori.hhs.gov/content/case-summary-sun-hui-bin).  In another instance, ORI found that a retired professor of oncology engaged in research misconduct by falsifying data included in six published papers and one grant application, and, as a result, required the respondent to exclude herself from contracting with government agencies and from serving in an advisory capacity to PHS, and to correct or retract four of the papers at issue. *See Case Summary: Wang, Ya*, Office of Research Integrity (available at https://ori.hhs.gov/content/case-summary-wang-ya).  Similarly, ORI found that a former professor of pharmacology who engaged in research misconduct in eight grant applications and six published papers would be adequately punished by agreeing to exclude himself from contracting with a government agency or participating in nonprocurement programs for three years, excluding himself from serving in an advisory capacity to PHS, and correcting or retracting two of the six papers. *See Case Summary: Jaiswal, Anil Kumar*, Office of Research Integrity (available at https://ori.hhs.gov/content/case-summary-jaiswal-anil-kumar).

121.     By reason of the foregoing, Defendant SUNY Downstate discriminated against Dr. Blain on the basis of sex by paying her wages at a rate less than the rate at which it pays its male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

122.     Defendant SUNY Downstate has paid Dr. Blain a salary less than that which it has paid to her male colleagues, despite their doing similar teaching and research work under similar working conditions.   In 2020, Dr. Blain, a tenured professor who taught several courses and conducted research pursuant to NIH grants she was awarded, was paid $113,014.   By contrast, a male colleague who was neither a tenured professor nor awarded any NIH grants was paid over $120,000.   Other male colleagues who were either tenured professors or awarded NIH grants (but not both) were paid, on average, over $140,000.   Another male colleague who was tenured and has grants (like Dr. Blain), was paid over $150,000.

123.     As a direct and proximate result of these actions, Dr. Blain suffered and continues to suffer actual damages in an amount to be determined at trial.

**<u>SECOND CAUSE OF ACTION</u>**
**(Retaliation Under the Equal Pay Act, 29 U.S.C. § 206(d)(1))**
**(Against Defendant SUNY Downstate)**

124.     Plaintiff repeats and realleges the allegations in paragraph 1 - 123 as if fully set forth herein.

125.     By reason of the foregoing, Defendant SUNY Downstate retaliated against Dr. Blain for having exercised her right to oppose and seek redress for labor law violations and discrimination on the basis of sex.

126.     On or about October 23, 2019, Dr. Blain's counsel submitted a letter to Defendant SUNY Downstate to complain of the sex-based discrimination, including unequal pay, that she

long experienced during her employment at Defendant SUNY Downstate.  Subsequently, on or about December 4, 2019, Dr. Blain met with Defendant SUNY Downstate's Office of Diversity & Inclusion to discuss her allegations of sex-based discrimination.

127.    Taking action against Dr. Blain to punish her for complaining about violations of labor laws (*i.e.*, complaining about pay discrimination) and anti-discrimination laws, Defendant SUNY Downstate engaged in a campaign of retaliation, including, among other things, causing the Inquiry Committee to falsely state to third parties, less than a week after Dr. Blain first filed her complaint, that ORI had determined that Dr. Blain committed research misconduct, contacting peer-reviewed academic journals asking for retractions of Dr. Blain's work, and removing her from grants.   These actions harmed Dr. Blain's reputation and business interests, spurring colleagues to avoid her and stymieing her ability to conduct important, long-term research.

128.    As a direct and proximate result of these actions, Dr. Blain suffered and continues to suffer actual damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Violation of N.Y. Labor Law 194)**
**(Against Defendant SUNY Downstate)**

129.    Plaintiff repeats and realleges the allegations in paragraph 1 - 128 as if fully set forth herein.

130.    By reason of the foregoing, Defendant SUNY Downstate discriminated against Dr. Blain on the basis of sex by paying her wages at a rate less than the rate at which it pays its male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

131.    Defendant SUNY Downstate has paid Dr. Blain a salary less than that which it has paid to her male colleagues, despite their doing similar teaching and research work under similar

working conditions.   In 2020, Dr. Blain, a tenured professor who taught several courses and conducted research pursuant to NIH grants she was awarded, was paid $113,014.  By contrast, a male colleague who was neither a tenured professor nor awarded any NIH grants was paid over $120,000.  Other male colleagues who were either tenured professors or awarded NIH grants (but not both) were paid, on average, over $140,000.  Another male colleague who was tenured and has grants (like Dr. Blain), was paid over $150,000.

132.    As a direct and proximate result of these actions, Dr. Blain suffered and continues to suffer actual damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**(Retaliation Under N.Y. Labor Law 194)**
**(Against Defendant SUNY Downstate)**

133.    Plaintiff repeats and realleges the allegations in paragraph 1 - 132 as if fully set forth herein.

134.    By reason of the foregoing, Defendant SUNY Downstate retaliated against Dr. Blain for having exercised her right to oppose and seek redress for labor law violations and discrimination on the basis of sex.

135.    On or about October 23, 2019, Dr. Blain's counsel submitted a letter to Defendant SUNY Downstate to complain of the sex-based discrimination, including unequal pay, that she long experienced during her employment at Defendant SUNY Downstate.  Subsequently, on or about December 4, 2019, Dr. Blain met with Defendant SUNY Downstate's Office of Diversity & Inclusion to discuss her allegations of sex-based discrimination.

136.    Taking action against Dr. Blain to punish her for complaining about violations of labor laws (*i.e.*, complaining about pay discrimination) and anti-discrimination laws, Defendant SUNY Downstate engaged in a campaign of retaliation, including, among other things, causing

the Inquiry Committee to falsely state to third parties, less than a week after Dr. Blain first filed

her complaint, that ORI had determined that Dr. Blain committed research misconduct, contacting

peer-reviewed academic journals asking for retractions of Dr. Blain's work, and removing her

from grants.   These actions harmed Dr. Blain's reputation and business interests, spurring

colleagues to avoid her and stymieing her ability to conduct important, long-term research.

137.    As a direct and proximate result of these actions, Dr. Blain suffered and continues

to suffer actual damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (Sex Discrimination under the NYSHRL)
### (Against Defendant SUNY Downstate)

138.    Plaintiff repeats and realleges the allegations in paragraph 1 - 137 as if fully set

forth herein.

139.    By reason of the foregoing, Defendant SUNY Downstate discriminated against Dr.

Blain within the meaning of the NYSHRL, N.Y. Exec. L. § 290 *et seq.*, on the basis of sex in

compensation and/or in terms, conditions, or privileges of employment.  A woman with sterling

credentials, Dr. Blain was subject to adverse actions including, among other things, Defendant

SUNY Downstate's decision to withhold from ORI -- despite ORI's instruction to notify it of the

results of any prior inquiry or review -- the fact that it had already conducted multiple

investigations of allegations of research misconduct and, instead, conduct an unfair investigation.

This campaign to discredit Dr. Blain by using a fundamentally unfair investigation clearly gives

rise to an inference of discrimination.  The denigrating and sexist treatment she experienced (*e.g.*,

being referred to as "soccer mom") bolsters this finding.

140.    Defendant knew of, disregarded, and failed to take any corrective action in response

to the discriminatory conduct of its administrators.

141.     As a direct and proximate result of these actions, Dr. Blain suffered and continues to suffer actual damages, including monetary damages, damages to her reputation and career, emotional pain, mental anguish, and humiliation, in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (Retaliation Under the NYSHRL)
### (Against Defendant SUNY Downstate)

142.     Plaintiff repeats and realleges the allegations in paragraph 1 - 141 as if fully set forth herein.

143.     By reason of the foregoing, Defendant SUNY Downstate retaliated against Dr. Blain for having exercised her right to oppose and seek redress for discrimination on the basis of sex.  Her engagement in this protected activity caused Defendant SUNY Downstate's materially adverse, and retaliatory, actions, which included, among other things, causing the Inquiry Committee to falsely tell third parties that ORI determined that Dr. Blain had committed research misconduct less than a week after she filed her complaint, contacting peer-reviewed academic journals asking for retractions of Dr. Blain's work, and removing her from grants.  These actions harmed Dr. Blain's reputation and business interests, spurring colleagues to avoid her and stymieing her ability to conduct important, long-term research.

144.     As a direct and proximate result of these actions, Dr. Blain suffered and continues to suffer actual damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
### (Sex Discrimination under the NYCHRL)
### (Against All Defendants)

145.     Plaintiff repeats and realleges the allegations in paragraph 1 - 144 as if fully set forth herein.

146.   By reason of the foregoing, Defendant SUNY Downstate discriminated against Dr. Blain within the meaning of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq*., on the basis of sex in compensation and/or in terms, conditions, or privileges of employment.   A woman with sterling credentials, Dr. Blain was subject to adverse actions including, among other things, Defendant SUNY Downstate's decision to withhold from ORI -- despite ORI's instruction to notify it of the results of any prior inquiry or review -- the fact that it had already conducted multiple investigations of allegations of research misconduct and, instead, conduct an unfair investigation.  This campaign to discredit Dr. Blain by using a fundamentally unfair investigation clearly gives rise to an inference of discrimination.   The denigrating and sexist treatment she experienced (*e.g*., being referred to as "soccer mom") bolsters this finding.

147.   Defendant SUNY Downstate knew of, disregarded, and failed to take any corrective action in response to the discriminatory conduct of its administrators.

148.   As a direct and proximate result of these actions, Dr. Blain suffered and continues to suffer actual damages, including monetary damages, damages to her reputation and career, emotional pain, mental anguish, and humiliation, in an amount to be determined at trial.

<u>**EIGHTH CAUSE OF ACTION**</u>
**(Retaliation Under the NYCHRL)**
**(Against All Defendants)**

149.   Plaintiff repeats and realleges the allegations in paragraph 1 - 148 as if fully set forth herein.

150.   The NYCHRL prohibits an employer from retaliating against any employee who has engaged in any activity protected by the NYCHRL.

151.   By reason of the foregoing, Defendant SUNY Downstate retaliated against Dr. Blain for having exercised her right to oppose and seek redress for discrimination on the basis of

sex.  Her engagement in this protected activity caused Defendant SUNY Downstate's materially adverse, and retaliatory, actions, which included, among other things, causing the Inquiry Committee to falsely tell third parties that ORI determined that Dr. Blain had committed research misconduct less than a week after she filed her complaint, contacting peer-reviewed academic journals asking for retractions of Dr. Blain's work, and removing her from grants.  These actions harmed Dr. Blain's reputation and business interests, spurring colleagues to avoid her and stymieing her ability to conduct important, long-term research.

152.   By reason of the foregoing, Defendants retaliated against Dr. Blain for having exercised her right to oppose and seek redress for discrimination on the basis of sex.

153.   Plaintiff is entitled to damages, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future emotional distress, punitive damages, and reasonable attorneys' fees and costs of this action.

## NINTH CAUSE OF ACTION
### (Defamation)
### (Against all Defendants)

154.   Plaintiff repeats and realleges the allegations in paragraph 1 - 153 as if fully set forth herein.

155.   By reason of the foregoing, Defendants made false statements to third parties that ORI and the NIH had determined that Dr. Blain committed research misconduct.  These false statements include, among other things:

a. A statement from the Inquiry Committee, made to Dr. Roman in a transcribed interview on or about October 28, 2019, that the Stewart Letter found "falsified data" and implied there was "clearly falsification of data."

b.  A statement from the Inquiry Committee, made to Dr. Roman in a transcribed interview on or about October 28, 2019, that "the Research Integrity Office showed that . . .  bands . . . were manipulated to look differently" and that the manipulation was "done with premeditation."

c.  A statement from the Inquiry Committee, made to Dr. Roman in a transcribed interview on or about October 28, 2019, that "the Office of Research Integrity analyzed [the 2015 MCB] paper and did find that exactly the same bands, things.  And that is almost by definition research misconduct."

d.  A statement from Defendant Dr. Christini, made to Dr. Jenny Libien between January 2022 and April 2022, that the NIH had found Dr. Blain committed research misconduct and had instructed SUNY Downstate to remove Dr. Blain from the grant.

e.  A statement from Defendant Dr. Christini, made to Dr. James Knowles and Dr. Roman between January 2022 and April 2022, that Dr. Blain had committed research misconduct.

156.  These false statements had the tendency to, and did, expose Dr. Blain to hatred, contempt, ridicule, and/or disgrace.

157.  Defendants made such statements knowing that they are false or with reckless disregard for the truth of the statement.

158.  The defamatory statements constitute defamation *per se* because they tend to injure Dr. Blain in her trade, business, or profession.

159.     Defendants' defamatory statements have directly and proximately caused Dr. Blain to suffer significant damages, including damage to her reputation and the loss of business opportunities.  These damages are ongoing in nature and will continue to be suffered in the future. Such damage was foreseeable to the Defendants.

160.     Defendants' defamatory conduct was done knowingly, intentionally, willfully, wantonly, and maliciously, with the intent to harm Dr. Blain, or in blatant disregard of the substantial likelihood of causing her harm, thereby entitling Dr. Blain to an award of punitive damages.

161.     As a direct and proximate result of these actions, Dr. Blain is entitled to compensatory, special, and punitive damages in an amount to be determined at trial.

## JURY TRIAL DEMANDED

162.     The Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff pray that the Court enter judgment and relief as follows:

a.     Declaring that the acts and omissions complained of herein are unlawful and violate the Equal Pay Act, New York Labor Law § 194, the NYSHRL, the NYCHRL, and New York common law;

b.     Awarding damages to Plaintiff, in an amount to be determined at trial, for lost opportunities and to otherwise make Plaintiff whole for any losses suffered as a result of Defendant's actions;

c.     Awarding Plaintiff compensatory damages, in an amount to be determined at trial, for humiliation, mental anguish, emotional distress, and injury to reputation;

d.     Awarding Plaintiff punitive damages in an amount to be determined at trial;

e.     Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of this action; and

f.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' actions.

Dated:  New York, New York
        May 23, 2022

                                        WALDEN MACHT & HARAN LLP

                                        By:     /s/ Milton L. Williams_____
                                                Milton L. Williams
                                                Jim Walden
                                                Johnson Lin
                                                Catherine Weiss
                                                250 Vesey Street, 27th Floor
                                                New York, NY 10281
                                                Tel.: (212) 335-2030
                                                Email: mwilliams@wmhlaw.com

                                                *Attorneys for Plaintiff*